RECORD NUMBER: 17-1483

# United States Court of Appeals

## *for the*

# Fourth Circuit

ANGELA ENGLE HORNE,

*Plaintiff/Appellant/Cross-Appellee,*

– v. –

WTVR, LLC, d/b/a CBS6,

*Defendant/Appellee/Cross-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA AT RICHMOND

# AMENDED RESPONSE/REPLY BRIEF
# OF APPELLANT/CROSS-APPELLEE

RICHARD F. HAWKINS, III
HAWKINS LAW FIRM, PC
2222 Monument Avenue
Richmond, VA 23220
(804) 308-3040
rhawkins@thehawkinslawfirm.net

*Counsel for Appellant*

CP  COUNSEL PRESS • VA – (800) 275-0668

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................iv

INTRODUCTION ...................................................................................1

REBUTTAL ARGUMENT ........................................................................3

I.      WTVR Plainly Misses The Most Important Point Of Horne's
        Argument About Why The District Court Abused Its Discretion In
        Denying Her Motion To Compel: The Fox Should Not Be Allowed
        To Guard The Henhouse..............................................................3

II.     WTVR's Defense Of The District Court's "Public Official" Ruling
        Is Contrary To Controlling Virginia Precedent, Would Essentially
        Turn Every Governmental Employee Into A "Public Official" For
        Defamation Purposes, And Is Contrary To The Basic Purpose Of
        The "Public Official" Doctrine.......................................................6

        A.      WTVR Wrongly Attacks Horne's Articulation Of The
                *Rosenblatt v. Baer* Rule Of Law ..........................................8

        B.      WTVR's String Citation To Cases Involving Lower Level
                Governmental Employees -- None Of Which Involve <u>School</u>
                Officials And Each Of Which Is Readily Distinguishable --
                Does Nothing To Help Its Position In This Court ..................9

        C.      Far From Proving That Horne Was A Public Official,
                WTVR's "CFO" Cases Fully Support The Position That
                Horne Was *Not* A Public Official .......................................12

        D.      Determining Whether Someone Is A Public Official Made On
                A "Case By Case" Basis And Must Be Viewed Through The
                Lens Of The Supreme Court Of Virginia's <u>Relatively Narrow</u>
                Application Of *Rosenblatt*................................................13

        E.      WTVR Places Far Too Much Weight On The *Appearance* Of
                Horne's Duties...................................................................16

III.    WTVR Woefully Understates, Especially Viewed In The Light
        Most Favorable To *Horne*, Horne's Evidence Of Actual Malice ................18

i

CROSS APPEAL ARGUMENT ...................................................................22

I.    WTVR Defamed Horne With Its Story And In Doing So, It Abused
      Any Protection It Might Have Otherwise Had Under The Fair
      Report Privilege ........................................................................................22

      A.    WTVR Defamed Horne ....................................................................22

            1.    General Principles ..................................................................23

            2.    Where There Are Competing Interpretations Of The
                  Allegedly Defamatory Words, At Least One Of Which
                  Is Capable Of Being Defamatory, Summary Judgment
                  Must Be Denied .....................................................................25

            3.    Defamation Claims Involving Television Stories Must
                  Be Analyzed With Particular Sensitivity To All Of The
                  Various Components Of The Video Broadcast ......................26

            4.    Summary Judgment Was Properly Denied By The
                  District Court Because WTVR's Broadcast Is
                  Reasonably Capable Of Being Defamatory To Horne ...........28

            5.    WTVR's Attempt To Spin Its Story Into A Tale Solely
                  About The "Hiring Process" Is Inconsistent With Its
                  Own Testimony .......................................................................31

            6.    WTVR's Focus On The Alleged Literal Truth Of Its
                  Statements In Its News Story Misses The Point And
                  Does Not Provide It With A Defense To Horne's Claim ........32

      B.    WTVR's Story Is Not Protected By The Fair Report Privilege..........34

II.   The Evidence, When Construed In Horne's Favor, Undeniably
      Showed That WTVR Acted Negligently.....................................................35

III.  Under No Circumstances Is Horne A "Limited Purpose" Public
      Figure .......................................................................................................36

      A.    General Principles Of Law Applicable To Limited Purpose
            Public Figure Analysis ....................................................................37

      B.    Horne Fails To Satisfy At Least Three Of The Second-
            Element Limited-Purpose Public Figure Criteria...............................39

            1.    Horne Did Not Have Access To Channels Of Effective
                  Communication .......................................................................39

2.    Horne Did Not Assume A Role Of "Special
Prominence" In The Controversy ...............................................39

3.    Horne Did Not Seek To Influence The Resolution Or
Outcome Of The Controversy ....................................................40

4.    WTVR's Legal Authorities Do Nothing To Show That
Horne Is A Limited Purpose Public Figure .............................41

CONCLUSION ...........................................................................................42

iii

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Anaya v. CBS Broad, Inc.*,
  626 F. Supp.2d 1158 (D.N.M. 2008).............................................................. 11, 12

*Ashcraft v. Conoco, Inc.*,
  218 F.3d 282 (4th Cir. 2000) ......................................................................5, 6

*Banka v. Columbia Broad. Co.*,
  63 F. Supp. 3d 501 (E.D. Pa. 2014)....................................................................35

*Basarich v. Rodeghero*,
  321 N.E.2d 739 (App. Ct. Ill. 1974)...................................................................14

*Baumback v. ABC*,
  1998 U.S. App. LEXIS 18770 (4th Cir. May 7, 1998) .........................................8

*Beeton v. District of Columbia*,
  779 A.2d 918 (D.C.) ..........................................................................................11

*Carey v. Hume*,
  492 F.2d 631 (D.C. Cir. 1974)................................................................... 2, 3, 4

*Carr v. Forbes*,
  259 F.3d 273 (4th Cir. 2001) ............................................................................37

*Carroll v. Jones*,
  74 Va. Cir. 466 (Portsmouth 2008) ...................................................................10

*Carwile v. Richmond Newspapers*,
  82 S.E.2d 588 (Va. 1954) ........................................................................ passim

*Corporate Training Unlimited v. NBC*,
  868 F. Supp. 501 (E.D.N.Y. 1994)............................................................. 25, 31

*Curtis Publishing Co. v. Butts*,
  388 U.S. 130 (1967) ..........................................................................................18

*David v. Borskey*,
    660 So.2d 17 (La. 1995) ...................................................................................11

*Dean v. Dearing*,
    263 Va. 485 (2002) .........................................................................................10

*Fanelle v. LoJack Corp.*,
    2000 U.S. Dist. LEXIS 17767 (E.D. Pa. Dec. 7, 2000) ......................... 23, 24, 33

*Fiacco v. Sigma Alpha Epsilon Fraternity*,
    528 F.3d 94 (1st Cir. 2008) ............................................................................7, 8

*Foretich v. Capital Cities/ ABC, Inc.*,
    37 F.3d 1541 (4th Cir. 1994) ...................................................................... 37, 40

*Freedlander v. Edens Broadcasting, Inc.*,
    734 F. Supp. 221 (E.D. Va. 1990) .....................................................................41

*Fuller v. Brownsville Independent School District*,
    2016 U.S. Dist. LEXIS 95227 (S.D. Tex. May 18, 2016) ............................. 12, 13

*Gertz v. Robert Welch, Inc.*,
    418 U.S. 323 (1974) .................................................................... 15, 37, 38, 39

*Gray v. Udevitz*,
    656 F.2d 588 (10th Cir. 1981) ..........................................................................12

*Guzzardo v. Adams*,
    411 So.2d 1148 (La. Ct. App. 1982) ..................................................................11

*Harte-Hanks Communications, Inc. v. Connaughton*,
    491 U.S. 657 (1989) .......................................................................................18

*Hatfill v. N.Y. Times Co.*,
    532 F.3d 312 (4th Cir. 2008) ...................................................................... 37, 39

*Hatfill v. New York Times Co.*,
    416 F.3d 320 (4th Cir. 2005) ...........................................................................28

*Hodges v. Okla. Journal Publ'g Co.*,
   617 P.2d 191 (Okla. 1980) ...................................................................12

*Hutchison v. Proxmire*,
   443 U.S. 111 (1979) .............................................................................7

*Hyland v. Raytheon Sevs. Tech. Co.*,
   670 S.E.2d 746 (Va. 2009) .................................................................24

*Johnston v. Corinthian TV Corp.*,
   583 P.2d 1101 (Okla. 1978) ...............................................................14

*Kassel v. Gannett Co.*,
   875 F.2d 935 (1st Cir. 1989) ........................................... 8, 9, 15, 17

*Lacey v. Judge*,
   2012 Ohio Misc. LEXIS 6290 (Franklin Cnty. Ct. of
   Common Pleas Nov. 2, 2012)...........................................................7, 9

*Landrum v. Board of Comm'rs*,
   685 So. 2d 382 (La. Ct. App. 4th, Nov. 27, 1996) ..............................16

*Lasky v. American Broadcasting Cos. Inc.*,
   631 F. Supp. 962 (S.D.N.Y. 1986) .....................................................25

*Lynch v. News Group Boston*,
   1993 Mass. Super. LEXIS 176 (Superior Court of
   Massachusetts August 3, 1993) .........................................................16

*Memphis Publishing Co. v. Nichols*,
   569 S.W.2d 412 (Tenn. 1979) ............................................................33

*Michaelis v. CBS, Inc.*,
   119 F.3d 697 (8th Cir. 1997) .............................................................33

*Mzamane v. Winfrey*,
   693 F. Supp. 2d 442 (E.D. Pa. 2010)..................................................18

*New York Times Co. v. Sullivan*,
   376 U.S. 254, 84 S.Ct. 710 (1964) ..................................... 1, 7, 11, 16

*Pendleton v. City of Haverhill*,
   156 F.3d 57 (1st Cir. 1998) ................................................................40

*Petersen County of Dakota, Minn.*,
   479 F.3d 555 (8th Cir. 2007) ............................................................11

*Phoenix Sav. & Loan, Inc. v. Aetna Casualty & Surety Co.*,
   427 F.2d 862 (4th Cir. 1970) ............................................................43

*Purvis v. Ballantine*,
   487 S.E.2d 14 (Ct. App. Ga. 1997) ............................................. 13, 17

*Reuber v. Food Chemical News, Inc.*,
   899 F.2d 271 (4th Cir. 1990) *reh'g granted and decision vacated on other
   grounds*, 922 F.2d 197 (4th Cir. 1990), *and on reh'g*, 925 F.2d 703
   (4th Cir. 1991) ...................................................................................9

*Richmond Newspapers, Inc. v. Lipscomb*,
   362 S.E.2d 32 (Va. 1987) ........................................................ passim

*Rosanova v. Playboy Enterprises, Inc.*,
   411 F. Supp. 440 (S.D. Ga. 1976), *aff'd,* 580 F.2d 859 (5th Cir. 1978) .............38

*Rosenblatt v. Baer*,
   383 U.S. 75 (1966) .................................................................. passim

*Shadle v. NEXSTAR Broad. Grp., Inc.*,
   2016 U.S. Dist. LEXIS 118379 (M.D. Pa. Aug. 31, 2016)................................31

*Sharpe v. Landmark Commc'ns, Inc.*,
   4 Cir. CL081664 (Norfolk 2009 ......................................................10

*Stevens v. Iowa Newspapers, Inc.*,
   728 S.W.2d 823 (Iowa 2007) ............................................................24

*Stokes v. CBS,*
   25 F. Supp. 2d 992 (D. Minn. 1999) ................................................26

*Tharpe v. Lawidjaja*,
  8 F. Supp. 3d 743 (W.D. Va. 2014)........................................................24

*Tomblin v. WHCS-TV8,*
  434 Fed. Appx. 205 (4th Cir. May 11, 2011) ................................. 21, 31

*Toney v. WCCO TV,*
  85 F.3d 383 (8th Cir. 1996) .................................................................33

*Vazquez Rivera v. El Dia, Inc.*,
  641 F. Supp. 668 (D.P.R. 1986) .................................................... 12, 13

*Wayment v. Clear Channel Broadcasting, Inc.*,
  116 P.3d 217 (Utah 2005) ....................................................................38

*Webb v. Virginian-Pilot Media Co., LLC,*
  752 S.E.2d 808 (Va. 2014) ...................................................................24

*Webb v. Virginian-Pilot Media Cos.*,
  2013 VA S.Ct. Briefs LEXIS 33 ..........................................................12

*Wells v. Liddy*,
  186 F.3d 505 (4th Cir. 1999) ................................................................28

*West v. Media Gen. Operations, Inc.*,
  2005 U.S. App. LEXIS 1586 (6th Cir. Jan. 31, 2005) ........................27

*White v. Fraternal Order of Police*,
  909 F.2d 512 (D.C. Cir. 1990).............................................................26

*WJLA-TV v. Levin*,
  564 S.E.2d 383 (Va. 2002) .......................................................... 41, 42

**Rules and Statutes**

Fed. R. Civ. P. 50 ...................................................................................22

**Other Authorities**

Prosser, The Law of Torts, § 116 5th ed. (Supp. 1988) ........................................23

Restatement (Second) of Torts, § 611 ...............................................................35

## INTRODUCTION

A defamation case like this one is basically an obstacle course for the plaintiff. First, she must jump through the "falsity" and "defamatory" hoops. Then, where the case involves a media defendant, she must navigate the maze associated with her alleged "public official" status and possibly even the greater maze associated with being a "limited purpose public figure."  Further, where, as here, a media defendant relies on a confidential source, the plaintiff must to try dodge the balls being thrown at her that try to thwart her efforts to her learn the identity of the source. And finally, if she has been weighted down with extra soggy gear known as the "actual malice" standard of proof, she must ascend and overcome the evidentiary rope ladder that requires her to prove that the defendant published its defamatory comments either knowing they were false or with reckless disregard to whether they were true or not. Only then can she reach the finish line.

Here, as Horne explained in her Opening Brief, Horne should have been allowed to finish the course. Not surprisingly, WTVR disagrees.  And with its cross-appeal in this matter, we now have at least seven distinct legal issues presented here before the Court. Most of these issues derive from the Supreme Court's landmark decision in *New York Times v. Sullivan*, 376 U.S. 254 (1964), which is central here. It should be noted, though, that *Sullivan*, like so many other Supreme Court cases from the 1960's and 1950's, was decided against the backdrop of the Civil Rights

1

Movement. Indeed, it cannot be ignored that in *Sullivan* the Supreme Court expressly overturned a $500,000 state court verdict from Alabama against the nationwide and out-of-state paper, The New York Times, that involved allegedly libelous statements about race-based police misconduct. 376 U.S. at 256, 283-284.

While the Civil Rights Movement has since faded, the media's embrace of *Sullivan* has only intensified. Indeed, media defendants, like WTVR here, have done their best to take even the highest of obstacles for plaintiffs and make them higher. This is especially true for WTVR's expansive view of the "public official" doctrine, its incorrect view of "actual malice," and its improper attempt to hide the identity of its confidential source from Horne. Presaging the internet, streaming, and YouTube era, Judge MacKinnon of the D.C. Circuit stated in 1974:

> The news media has been quick to take advantage of this new-found freedom [from *New York Times* and its progeny] and since the decision in *New York Times*, *supra,* the nation has witnessed an enormous expansion in the publication of articles and statements that under prior law would have subjected the publishers to liability for libelous defamation. This development in the law also comes at a time when the speed of electronic communication has greatly increased and a growing concentration has developed in the ownership, power and influence of the news media. This, coupled with the existence of widespread electronic communication networks, vests a relatively small number of people with the ability within a few minutes to blanket the nation with statements that for the prior 200 years were held to be actionable libel.

*Carey v. Hume*, 492 F.2d 631, 640 (D.C. Cir. 1974). He stated: "[t]his is an enormous power." *Id.* And it is. And here, it was abused by WTVR.

2

REBUTTAL ARGUMENT

In her Opening Brief, Horne identified three specific errors made by the District Court: (i) it abused its discretion by denying her motion to compel WTVR to disclose the identity of its confidential source; (ii) it erred by holding that she was a "public official" and (iii) it erred when it took her case away from the jury at the close of her evidence on the belief that she had not presented sufficient evidence that WTVR acted with "actual malice." WTVR has opposed each of these arguments, and each is addressed in turn.

**I.     WTVR Plainly Misses The Most Important Point Of Horne's Argument About Why The District Court Abused Its Discretion In Denying Her Motion To Compel: The Fox Should Not Be Allowed To Guard The Henhouse**

First, WTVR defends the District Court's denial of Horne's motion to compel by basically saying that the fox should be allowed to guard the henhouse. Indeed, WTVR barely pays lip service to the most important part of Horne's motion to compel position – the inequity that is plain on its face when a media defendant seeks to a hold a defamation plaintiff to the heightened "actual malice" standard under *New York Times v. Sullivan* and yet at the same time seeks to prevent discovery of its sources. This heightened standard is critical because, by definition, it renders information about a reporter's confidential source to be "relevant." As Judge MacKinnon of the D.C. Circuit pointedly explained in his concurring opinion in *Carey v. Hume*, 492 F.2d 631 (D.C. Cir. 1974):

3

In this case we are requested by appellant, a news reporter, to decide that the news media in effect possesses virtually absolute immunity from liability for libel. This would result if those employed by the news media were freed from the obligation to testify as to their sources, or alleged sources, of their libelous publications. If that were the law, the reporters and their employers (newspapers and broadcast stations) could _**as a practical matter in most cases never be held accountable for the serious injuries they cause**_. In cases where recovery is justified the amount of damage, which depends upon the degree of malice, would be much more difficult, if not impossible, properly to assess where the reliability or existence of an alleged informant _**is unknown and unknowable.**_ The appellant, Britt Hume, admitted as much in an article of his published in The New York Times Magazine, December 17, 1972:

> Yet Carey has a point. If newsmen can refuse to name the source of defamatory stories, they can effectively vitiate what is left of the libel laws [after New York Times v. Sullivan] by hiding behind anonymous sources whenever sued.

> The logic of that statement by Hume disposes of his argument in this case and should dispose of any claim for a reporter's immunity if the law _**is to be fair to the general public**_. If the law were otherwise, _**an injured plaintiff attempting to prove his case would face a blank wall, with practically no opportunity to discover the identity of the alleged source upon which the defense claims reliance.**_

_Id._ at 640 (emphasis added).

Here, WTVR improperly asks Horne to "face a blank wall" as to its source. To be sure, WTVR is quick say that its reporter _believed_ that its confidential source was _reliable_ and that, as such, it had no reason to think that its news story was false. JA420-421. In other words, WTVR plainly uses the fact of its confidential source as a feather in its cap to rebut the notion that it acted with "actual malice." But WTVR

4

improperly scoffs at the notion that it must *identify* its source on the grounds that Horne is merely speculating that the information the source may have. Appellee's Br. at 27-28.

Horne's motion goes beyond mere speculation. While she does not know the precise nature of the information the confidential source revealed to Wayne Covil, WTVR's reporter, Horne *does* know that the source provided information about her hiring and firing that had not been widely disseminated and could not have been readily obtained. Horne *also* knows that Covil *later* received an anonymous e-mail that raised a serious "red flag" about the circumstances under which Horne had been hired in the first place. As such, questions reasonably arise as to whether Covil's decision not to follow up on that anonymous e-mail with his confidential source was justified. *And* we know that Covil dissembled at trial by testifying – *contrary* to his previous sworn deposition testimony – that he *did* reply to the anonymous e-mail. This means we cannot simply take his word for it that his confidential source *only* provided him with minimal information about Horne. These three considerations – especially in the context of a case involving "actual malice" -- tip the balance in favor of disclosure.[1]

---

[1] This Court's decision in *Ashcraft v. Conoco, Inc.*, 218 F.3d 282 (4th Cir. 2000) – relied upon by WTVR in its Brief (Appellee's Br. at 26) – is not to the contrary. Indeed, *Ashcraft* was not even a defamation case, and thus, by definition, did not involve any factual circumstances similar to those at issue here. More importantly, in *Ashcraft*, the "compelling interest" that supposedly justified the disclosure was

It should also be noted that Horne's motion to compel did not – and *does not* -- rest on a "non-specific need to impeach a witness," as suggested by WTVR in its brief. Appellee's Br. at 25. WTVR relies on *Brown v. Commonwealth*, 204 S.E.2d 429 (Va. 1974), for this assertion. But that case involved the impeachment of a third-party witness with statements that the Virginia Supreme Court described as "collateral and not material." *Id.* at 431. Here, by contrast, Horne seeks to impeach *the reporter at issue* – i.e., the person whose credibility is central to the entire case – with statements that go to the heart of his mentality about whether he honestly believed that the information he was broadcasting to the public about Horne was true. This is a far more compelling set of facts.

**II.   WTVR's Defense Of The District Court's "Public Official" Ruling Is Contrary To Controlling Virginia Precedent, Would Essentially Turn Every Governmental Employee Into A "Public Official" For Defamation Purposes, And Is Contrary To The Basic Purpose Of The "Public Official" Doctrine**

Next is the "public official" issue. The Supreme Court has never precisely defined the boundaries of who is – and isn't – a "public official" under *Rosenblatt v. Baer*, 383 U.S. 75, 85 (1966). *See Hutchison v. Proxmire*, 443 U.S. 111, 119, n.8

---

the enforcement of order sealing the case. This Court, however, ruled that the district court's "sealing order [was] invalid." *Id.* at 288. It necessarily follows, then, that enforcement of an invalid order "cannot serve as compelling interest justifying disclosure of a reporter's confidential notes." *Id.* No similar invalidities exist here, and thus *Ashcraft* does not support the District Court's decision below.

6

(1979). *Hutchison v. Proxmire*, 443 U.S. 111, 119, n.8 (1979).[2] The Court has made it clear, however, that the "public official" category "cannot be thought to include *all* public employees." *Id.* (emphasis added). *See Fiacco v. Sigma Alpha Epsilon Fraternity*, 528 F.3d 94, 99 (1st Cir. 2008) ("Not every public employee is a public official."). Otherwise, courts would never need to even inquire into the matter – they would simply apply a *per se* rule based solely on the public employee's employment status.

Here, however, WTVR's defense of the District Court's erroneous "public official" ruling essentially turns the *Rosenblatt* standard into a *per se* rule. As explained below, WTVR – both factually and legally -- advocates far too broad a view of *Rosenblatt*. In doing so, it lumps all "low level" public employees together and also skirts key precedent from the Supreme Court of Virginia on the application of *Rosenblatt* in the public education context. Indeed, the central case on which Horne builds the edifice of her "public official" position – *Richmond Newspapers, Inc. v. Lipscomb*, 362 S.E.2d 32 (Va. 1987) -- is nowhere to be found in the "public

---

[2] "The Supreme Court in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710 (1964) held that public officials must prove actual malice in order to succeed in defamation suits. But the Court has consistently sidestepped opportunities to define the term." *Lacey v. Judge*, 2012 Ohio Misc. LEXIS 6290 at *5-6 (Franklin Cnty. Ct. of Common Pleas Nov. 2, 2012).

official" section of WTVR's response brief.[3]  WTVR's position – like that of the
District Court – cannot survive scrutiny.

### A. WTVR Wrongly Attacks Horne's Articulation Of The *Rosenblatt v. Baer* Rule Of Law

To begin, WTVR takes aim at Horne's articulation of the "public official" rule
of law by saying she has too narrowly stated the rule.  Horne disagrees. To be sure,
as WTVR correctly explains in its brief, the *Rosenblatt* standard – when fully quoted
in the abstract – is a *minimum* threshold standard. Appellee's Br. at 45. However, in
application, the standard is *generally applied* exactly as Horne has stated. As the
First Circuit, in an opinion this Court has favorably cited,[4] explained:

> [g]enerally speaking, the [public official] classification ***embraces only***
> those public employees with 'substantial responsibility for or control
> over the conduct of governmental affairs.'

*Kassel v. Gannett Co.*, 875 F.2d 935, 939 (1ˢᵗ Cir. 1989) (emphasis added). *See also*

*Fiacco*, 528 F.3d at 99 ("***Only those*** public employees with 'substantial
responsibility for or control over the conduct of governmental affairs,' . . . should
be considered public officials.").

---

[3] Ironically, WTVR cites *Lipscomb* to try to show that under controlling precedent,
Horne's evidence is insufficient to establish "actual malice." *See* Appellee's Br. at
39. This effort plainly fails, however, as Horne's evidence meets ***any*** test for actual
malice, including that which was applied in *Lipscomb*. Regardless, WTVR must take
both the baby *with* the bathwater and must be subject to all parts of *Lipscomb*, not
simply those selective parts which it believes support its positions in this case.

[4] *Baumback v. ABC*, 1998 U.S. App. LEXIS 18770 at *9 (4ᵗʰ Cir. May 7, 1998).

The point is that while the *Rosenblatt* test is broad in the abstract, *in general*, it has practical limitations, especially when applied, as here, to non-elected public officials.[5] Those limitations are best analyzed – in Horne's view – through the three-legged stool metaphor adopted by the First Circuit in *Kassel*. 875 F.2d at 939. Horne submits this metaphor – which has been applied beyond the First Circuit[6] and which has been referenced by this Court[7] – best balances the competing constitutional and reputational concerns and is fully consistent with the Supreme Court of Virginia's analysis of those concerns in *Lipscomb*.

    **B.**    **WTVR's String Citation To Cases Involving Lower Level Governmental Employees -- None Of Which Involve _School_ Officials And Each Of Which Is Readily Distinguishable -- Does Nothing To Help Its Position In This Court**

WTVR next tries to defend its position by lumping numerous low-level public employees from numerous jurisdictions together into a large group and then ***wrongly***

---

[5] Horne most certainly was not – and is not – seeking to misquote or "conveniently" quote (as asserted by WTVR in its brief, Appellee's Br. at 44) the legal standards applicable to the "public official" inquiry.

[6] *Lacey v. Judge*, 2012 Ohio Misc. LEXIS 6290 at *6-7 (Franklin Cnty. Ct. of Common Pleas Nov. 2, 2012) (applying the First Circuit's three-legged stool metaphor to the "public official" determination).

[7] *Reuber v. Food Chemical News, Inc.,* 899 F.2d 271, 282 n.19 (4th Cir. 1990) (citing *Kassel* and describing the case as "applying a three-part test to uphold a finding that a staff psychologist at the Veteran's Administration was not a 'public official'"), *reh'g granted and decision vacated on other grounds*, 922 F.2d 197 (4th Cir. 1990), *and on reh'g*, 925 F.2d 703 (4th Cir. 1991).

claiming that each of these persons would not be considered a "public official" under Horne's formulation of the *Rosenblatt* test. This is nonsense. The falsity of WTVR's sweeping claim is shown by succinctly examining the *unique* facts of just a few of the veritable kitchen-sink of its cases and realizing that each of those officials possess -- *or appear to possess* -- far greater duties, responsibilities, and public personas than Horne does here, to wit

- *Auvil v. Times Journal Co.* – This case involved a receptionist who had daily contact with the public as part of her essential job duties. Horne had no such duties.

- *Dean v. Dearing*, 263 Va. 485 (2002) – **This case has *nothing to do at all* with the application of the "public official" test from *Rosenblatt.*** It involved a police officer suing under a small group theory of defamation, which was the only issue before the Virginia Supreme Court. There is no discussion at all of the officer's duties or whether under *Rosenblatt*, the officer is or is not a "public official" – regardless of either his actual or apparent job responsibilities. It is unclear why this case is even included in WTVR's string citation.

- *Sharpe v. Landmark Commc'ns, Inc.*, 4 Cir. CL081664 (Norfolk 2009 (CaseFinder) – This case involved a *public relations officer* who, by definition, had *media responsibilities **with the public***. Horne, by contrast, has no such responsibilities and no *apparent* media responsibilities.

- *Carroll v. Jones*, 74 Va. Cir. 466 (Portsmouth 2008) – This case involved a "Director of Contracting," who was held to a public figure because *in actual fact*, he "had ***almost unbridled authority to spend millions of dollars of Navy money***" and "had ***considerable authority to determine who received and who did not receive government contracts*.**" *Id.* at 470 (emphasis added). Horne, by contrast, had ***no*** authority to spend money for the School System, nor did she have any authority – actual or

10

apparent – to decide who received and did not receive School System contracts.

- *Petersen County of Dakota, Minn.*, 479 F.3d 555 (8th Cir. 2007) – This case involved a social worker with day-to-day interaction with the public involving intake matters for family conflicts, injuries to children, placing, children in foster care and providing assistance for the developmentally disabled. *Id.* at 557. It also provided no analysis for its decision, other than a citation to *New York Times v. Sullivan. Id.* at 561. In any event, Horne had no day-to-day responsibilities involving interaction with the public.

- *Beeton v. District of Columbia,* 779 A.2d 918 (D.C.) – This case involved a corrections officer – who was the *OFFICER IN CHARGE* – of one of the units at the Lorton Correctional facility in Lorton, Virginia. This Court treated the plaintiff as a law enforcement officer, which is a unique context wholly unto itself for purposes of the "public official" determination. *See, Anaya v. CBS Broad, Inc.*, 626 F. Supp.2d 1158, 1202 (D.N.M. 2008).

- *David v. Borskey*, 660 So.2d 17 (La. 1995) – This case involved a purchasing agent who *had* the *actual authority* "to negotiate financial transactions *and handle* significant amounts of university funds." *Id.* at 21 n.6 (emphasis added). Here, of course, Horne had neither actual nor apparent authority to *negotiate* any financial matters for the School System, nor did she handle – or have the apparent authority to handle – any School System funds.

- *Guzzardo v. Adams*, 411 So.2d 1148 (La. Ct. App. 1982) – This case involved a Personnel Coordinator for the local Clerk of the Court. He interacted with the public vis-à-vis screening applications for prospective employees and critically, he made himself the public spokesperson for the Clerk's office with respect to the controversy at issue in that case and *actually reported to the press* what was going on. In other words, he had *actual* interactions with the public and *actual* media responsibilities. Horne, by contrast, has no actual or apparent media responsibilities.

11

- *Gray v. Udevitz*, 656 F.2d 588 (10th Cir. 1981) – This case involved a police officer, which has unique enforcement powers and public responsibilities that are not present here. *See, Anaya v. CBS Broad, Inc.*, 626 F. Supp.2d 1158, 1202 (D.N.M. 2008).

- *Hodges v. Okla. Journal Publ'g Co.*, 617 P.2d 191 (Okla. 1980) This case involved a license tag agent who, unlike Horne, had the responsibility for "the collection and accounting for substantial amounts of public funds" or the job of "administering an area of the law which affected practically every citizen of Oklahoma County.

It is also worth noting that none of these cases involves public school officials. Indeed, it is a testament to the weakness of WTVR's position on this issue that it must resort to citing 18 inapposite cases rather than *just one* which could conceivably prove its position. It is as if WTVR simply lifted wholesale a string cite from some other seemingly authoritative source and then dropped the whole irrelevant citation into its brief.  *See Webb v. Virginian-Pilot Media Cos.*, 2013 VA S.Ct. Briefs LEXIS 33 at *39-40 (listing virtually the same list of string citations in support of similar argument that plaintiff must be a public official).

## C. Far From Proving That Horne Was A Public Official, WTVR's "CFO" Cases Fully Support The Position That Horne Was *Not* A Public Official

WTVR then turns its focus to cases such as *Fuller v. Brownsville Independent School District*, 2016 U.S. Dist. LEXIS 95227 (S.D. Tex. May 18, 2016) and *Vazquez Rivera v. El Dia, Inc.*, 641 F. Supp. 668 (D.P.R. 1986) involving public employees who were "CFOs" and tries to compare the plaintiffs there to Horne here.

12

Neither case fits. *Fuller*, for example, involved the actual CFO of the local school system, *id*. at *6, who not only was responsible for tracking the school system's budget but also *allocating* the school system's funds, *id.* at *38. Horne, of course, had no such actual or apparent allocation duties. Likewise, in *Rivera*, the public employee had to *supervise* the auditing of *other regional offices* and oversee the monies at issue. Here, by contrast, Horne supervised no one and simply prepared binders based on information supplied to her by others.

> **D.  Determining Whether Someone Is A Public Official Made On A "Case By Case" Basis And Must Be Viewed Through The Lens Of The Supreme Court Of Virginia's _Relatively Narrow_ Application Of *Rosenblatt***

WTVR's mountain of irrelevant case law also does not change the most basic principle of law for purposes of analyzing public officials: the "determination is made on a case-by-case basis." *Purvis v. Ballantine*, 487 S.E.2d 14, 17 (Ct. App. Ga. 1997). As such, it matters not whether forty cases exist involving persons with *titles* similar to Horne's. It matters whether her unique *responsibilities and duties* involved *actual* or *apparent authority or governmental control.* Here, they do not.

While WTVR has emphasized Horne's job description and her employment in the public education context, it ignores the fact that the Supreme Court of Virginia has not afforded the public education context the majesty it advocates. To the contrary, the Virginia Supreme Court in *Lipscomb* specifically held that a local school teacher did *not* hold a position that independently invited public scrutiny. 362

S.E.2d at 37. As the court explained:

> There has been no showing that Lipscomb, who was not an elected official, ***either influenced or even appeared to influence or control any public affairs or school policy***. On the contrary, the evidence shows her to have limited her activities to teaching and acting as a temporary department head of a small number of other English teachers.

*Id.* at 37 (emphasis added).

Just as importantly, in *Lipscomb*, the Supreme Court fully recognized that a split of authority existed over the issue, *id.* at n. 3, and chose *not* to follow those cases holding that public school teachers were "public officials." In doing so, then, it necessarily rejected the numerous cases which rested on the rationale – which underlies the entirety of WTVR's "public official" position -- that working in public education, by itself, invites public scrutiny. *See, e.g., Johnston v. Corinthian TV Corp.*, 583 P.2d 1101, 1103 (Okla. 1978) (holding a public school physical education teacher was a "public official" under *Rosenblatt* because "we can think of no higher community involvement touching more families and carrying more public interest than the public school system."); *Basarich v. Rodeghero*, 321 N.E.2d 739, 742 (App. Ct. Ill. 1974) (holding that public school coaches and teachers were "public officials" under *Rosenblatt*; explaining "it is clear that education is a prime governmental responsibility. Public school systems, their athletic programs, and those who run them are consistent subjects of intense public interest and substantial publicity."). Clearly, under Virginia law, it does not.

14

Finally, the Supreme Court in *Lipscomb* emphasized as "guidance" on the "public official" issue the fact that "public officials" often are able to engage in self-help when it comes to defamation. Echoing one of the key legs of the three-legged stool from *Kassel*, the Supreme Court recognized that:

> Public officials . . . usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy. Private individuals are therefore more vulnerable to injury, and the state interest in protecting them is correspondingly greater.

*Id.* at 17 (quoting *Gertz*, 418 U.S. at 344).

With *Lipscomb* providing the proper analytical lens for determining whether Horne is a "public official," it becomes clear that her mere status as a Director of Financing invites no special public scrutiny. Indeed, it cannot be said that school budgets are legally more important to the outside public than day-to-day interaction between students and teachers. Allegations of teacher abuse or incompetence are far more likely to garner media attention than the issue of whether or not a school system will be buying extra chairs for its schools or new gymnasium equipment. While the Supreme Court of Virginia most certainly *could have* recognized public education employment as having important legal status for public official determinations, it did not. And thus, Horne must be judged accordingly, not as part of an overall view that public education is important to the community.

15

### E.    WTVR Places Far Too Much Weight On The *Appearance* Of Horne's Duties

As a final matter, WTVR places far too much weight on the *appearance* of Horne's alleged duties.  *Cf. Landrum v. Board of Comm'rs*, 685 So. 2d 382, 391 n.7 (La. Ct. App. 4th, Nov. 27, 1996) ("We are not aware of any per se rule which would establish that a career civil servant is a 'public official' under *New York Times* merely because he or she is in an upper administrative level.").It focuses on Horne's job description, but one must ask – is any member of the public who attends Prince George County School Board budget meetings and watches Horne act as second-chair while the Superintendent presents *his* budget to the Board going to look at those duties in that context and think that *she* is in charge of the budget process?  No. Horne's job description is not on the School System's website or otherwise readily available to the public.[8]  *See* JA907. By contrast, the fact of Horne's limited duties *was* available for public consumption. And her limited public persona confirmed that she did *not* have actual or apparent responsibility, control, or policy-making authority while employed at the School System.[9]

---

[8] WTVR's focus on the Virginia Code's provisions relating to School Boards and Superintendents is likewise misplaced.  Noticeably absent from any of WTVR's discussion is any provision relating to a budget position such as Horne's.

[9] And even Horne's public persona must be viewed with a grain of salt.  *See, Lynch v. News Group Boston*, 1993 Mass. Super. LEXIS 176 (Superior Court of Massachusetts August 3, 1993) ("The defendants incorrectly place great weight on the fact that Lynch's duties bring him into contact with members of the public and

Again, it must be noted that the best way to view this issue is through the three-legged stool metaphor from the First Circuit's *Kassel* decision. In this respect, it should be remembered that Horne did *not* have ready access to media outlets and could not reasonably be expect to have forfeited her reputational rights simply because she signed up for employment with the School System.[10] With all of this said, the District Court erred in concluding that Horne was a "public official" and WTVR has said nothing that changes that conclusion.[11]

---

members of the media. The fact that the media regularly cover senate proceedings, and that Lynch may speak with them on a daily basis, does not mean that he has access to the media for purposes of balancing any injustices caused to him by the media; there is no indication, for example, that Lynch has the ability to call a press conference to voice his point of view.").

[10] If anything, the case law shows that Superintendents, not Budget Directors, occupy the financial duties for a school system that help make them "public officials." *See, e.g., Purvis v. Ballantine*, 487 S.E.2d 14, 17-19 (Ct. App. Ga. 1997) ("In this case, the evidence shows that Purvis was superintendent of the Clarke County school system from July 1982 through December 1991. As such, he was the school system's chief executive and operating officer, and he kept the public informed about the operation of the school system. He was interviewed by the newspapers on nearly a weekly basis regarding the school system, and twice weekly he broadcast a radio program to the public about the status of the school system. He routinely made personnel, administrative, and budgetary decisions affecting the school system, which consisted of over 10,000 students, and dealt with all major problems in every aspect of the school district's operation.").

[11] As a further comment on this issue, it might be expected that WTVR would argue that the public would care if Horne screwed up a budget or engaged in some kind of malfeasance as to budgetary matters and thus the public would care about such matters. Indeed, the public might. But in that particular context, *unlike here*, Horne would be a "limited purpose public figure" because the controversy would involve

17

### III.    WTVR Woefully Understates, Especially Viewed In The Light Most Favorable To *Horne*, Horne's Evidence Of Actual Malice

In her Opening Brief, Horne catalogued numerous specific items of evidence that, when viewed individually and *especially when viewed as a whole*, showed that WTVR's reporter Wayne Covil and its editorial staff published a news story about Horne with reckless disregard for the truth of its story about Horne. As Horne has explained, she contends that the circumstantial evidence in this case convincingly shows that Covil *had a high degree of awareness of probable falsity* about the truth of his story.[12]  Did he admit at trial that he had such a high degree of falsity?  Of

---

her public duties.  That is not the case here, where WTVR's news story focused on job qualifications that are applicable to *all* public school employees in Virginia.

[12] WTVR repeatedly quibbles with Horne's statement of the rules of law applicable to proving "actual malice," but to no avail.  Contrary to the string cite listed by WTVR in footnote 3 of its brief, courts around the country have *not* rejected willful blindness and/or deliberate indifference as a method of proof for showing that a media defendant circumstantially has a high degree of awareness of the falsity of its product or that it entertained serious doubts about the truth of its publication.  The only meaningful principles that can be gleaned from WTVR's citations are the undisputed and unremarkable rules that simple evidence of failure to investigate or ill will to the subject of the story is not sufficient to prove actual malice.  Separately, WTVR is incorrect in its claim that the *Mzamane v. Winfrey*, 693 F. Supp. 2d 442, 506 (E.D. Pa. 2010) case rests on Justice Harlan's improper approach to reckless disregard as stated in its opinion in *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 155 (1967).  To the contrary, the opinion makes plain that it rests on the widely cited and applied language from *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 692 (1989) to the effect that while the failure to investigate is one thing, "the purposeful avoidance of the truth is in a different category."  That is a sound legal foundation for Horne's actual malice position.

18

course. Such admissions are virtually non-existent. But when Covil was faced with the "red flag" e-mail from the anonymous source, when Covil was also faced with instructions from his supervisor to further investigate that e-mail *after* he had completed his news story, and in the context of Covil's own dissembling trial testimony, the circumstantial evidence clearly and convincingly shows that facts existed which were contrary to Covil's story.[13]

For its part, WTVR takes issue with Horne's characterization of the items of so-called "red flag" evidence. It says, for example, that the anonymous e-mail "in no way states, hints, or suggests that Plaintiff had disclosed her felony to Browder." Appellee's Br. at 9. This is correct insofar as it goes. But the tone and tenor of the e-mail are ominous and accusatory. The e-mail strongly suggests that the fault for as to "how this happen[ed]" (i.e., the hiring of a felon) lays with one or both of the School Board and/or Browder. JA910. Indeed, the e-mail clearly paints a connection between *Browder's raise* and the fact that felon got hired – as if to say that the School Board somehow bribed Browder or paid him off to avoid making public disclosure

---

[13] Because the evidence at trial was almost perfectly duplicative of the evidence submitted by Horne in opposition to WTVR's summary judgment motion on the issue of actual malice, Horne submits that this evidence, contrary to WTVR's position on appeal, rightfully led the District Court to deny WTVR's summary judgment on the issue of actual malice. Horne will not separately set forth a section on this issue, although it suffices to add that the issue of actual malice is a subjective inquiry and such subjective inquiries – as the District Court appropriately noted – are usually best avoided at the summary judgement stage.

of what really happened during the hiring process.

That the e-mail invites the reader to deduce wrongdoing rather than spelling it out directly does nothing to undermine its value. It takes aim at both the School Board and Browder. It also directly informs Covil that the *School Board now is fully informed about the issue*. The next logical step of inquiry therefore would be to reach out to the School Board or even Covil's confidential source. Indeed, the latter is exactly what Covil's supervisor directed him to do. Where the evidence shows that this was *not done* and where the evidence ultimately proves the falsity of WTVR's story (especially when coupled with Covil's dissembling testimony), the evidence clearly allows a jury to conclude that Covil suspected that his story was false but deliberately avoided taking actions that would prove this to be the case. That is sufficient to show actual malice.

As an additional matter, it is worth noting that WTVR – with hindsight, of course -- finds it absurd and in defiance of common sense that it would bury the lead of a much more newsworthy story – namely about Browder hiding Horne's felony from the School Board – in order to move forward with its "Hired Then Fired" story about Horne. But the issue here is not newsworthiness. It is falsity. Covil suspected something was false about his story at the time it was published. Did he know that Browder was the culprit and that Horne had fully disclosed her prior felony conviction? Not exactly. But the evidence shows that he certainly suspected that

20

Horne was not to blame for her illegal hiring. That's the whole message of the anonymous e-mail. Indeed, the one person upon whom the e-mail does *not* place blame for Horne's hiring is Horne.

Now, was Covil distracted? Was he too busy? Did he simply not care, because he had already packaged his story and submitted it? It doesn't matter. At the time his story was submitted, Covil knew something was wrong with it, and all of his post-submission actions – *not responding to the anonymous e-mail, not calling the School Board members that he now knew were aware of Horne's hiring, not following up with Browder to ask him about the e-mail, and not even following up with his own confidential source* – show that he deliberately chose not to dig further because to do so would have required him to change the message of a story that he had already decided was the one he wanted to go with.

Finally, Horne relied on several cases to show that her evidence of actual malice stacks up with evidence that courts – including this one – have found to be sufficient. *See* Appellant's Br. at 54. *See Tomblin v. WHCS-TV8,* 434 Fed. Appx. 205 (4th Cir. May 11, 2011). Horne will not fully repeat her discussion of these cases, but notes that WTVR has failed to cite, much less even address, these cases.

CROSS APPEAL ARGUMENT

On its cross-appeal, WTVR raises four issues of its own: (i) that it accurately reported its story about Horne; (ii) that its story is protected by the Fair Report Privilege; (iii) that it did not act negligently; and that (iv) that Horne, even if she is not a "public official," is nevertheless a limited purpose public figure for purposes of the story.[14] None of these arguments has merit. Each is addressed herein, although the first two can and will be addressed together.

### I. WTVR Defamed Horne With Its Story And In Doing So, It Abused Any Protection It Might Have Otherwise Had Under The Fair Report Privilege

### A. WTVR Defamed Horne

In both its rulings on WTVR's motion to dismiss and its motion for summary judgment, the District Court concluded that WTVR's story was reasonably capable of defaming Horne. As it explained in its summary judgment opinion,

> In this case, the WTVR segment is reasonably capable of the defamatory meaning alleged by Horne. The segment began with the report that the School System had hired, and then fired, a convicted felon. Covil explained that Browder could not discuss personnel matters, so WTVR would instead explain the hiring process. Nevertheless, throughout the segment, the banner at the bottom of the screen read "Felon Hired, Then Fired." The segment ended with the fact that it is a crime to make false representation about criminal convictions

---

[14] WTVR also appeals the denial of its summary judgment motion on the issue of actual malice. As already explained herein, Horne will not separately address this issue since it almost completely overlaps with her evidence and argument related to the "actual malice" Rule 50 matter. She obviously contends, though, that her evidence was both sufficient to withstand summary judgment *and* Rule 50.

22

when filling out an application. Taken in context, including both the words spoken and the images displayed, the segment is reasonably capable of conveying that the School System fired the "Felon" because she lied about her conviction when filing out her application. Like the article in Carwile, the segment gives rise to this implication despite the fact that Browder would not discuss the specific situation. Through its presentation, WTVR "suggests in a veiled but pointed way" why the School System fired Horne, and that Horne committed a crime when she filled out her application. Because the segment is reasonably capable of the alleged defamatory meaning, the jury must decide whether the statement was actually defamatory.

JA684-685. These conclusions were plainly correct.

## 1.    General Principles

In Virginia, a defamatory charge need not be express or direct to be actionable. *Carwile v. Richmond Newspapers,* 82 S.E.2d 588, 592 (Va. 1954). Instead, it may be made "by inference, implication, or insinuation." Id (emphasis added). Libel-by-implication is a well-recognized theory of defamation. As Professor Prosser has explained:

> If the defendant juxtaposes [a] series of fact so as to imply a defamatory connection between them, or [otherwise] creates a defamatory implication … he may be held responsible for the defamatory implication, unless it qualifies as an opinion, even though particular facts are correct.

PROSSER, The Law of Torts, § 116 5th ed. (Supp. 1988) (cited and quoted in *Fanelle v. LoJack Corp*., 2000 U.S. Dist. LEXIS 17767 at *10 (E.D. Pa. Dec. 7, 2000)). As the Supreme Court of Virginia stated more than sixty years ago, "it matters not how artful or disguised the modes in which the meaning is concealed if it is in fact

23

defamatory." *Id*. "Otherwise, by a careful choice of words in juxtaposition of statements in a publication, a potential defendant may make statements that are true yet just as damaging as if they were actually false." *Stevens v. Iowa Newspapers, Inc*., 728 S.W.2d 823, 828 (Iowa 2007).

"Where, as here, a plaintiff alleges that [she] has been defamed not by statements of fact that are literally true but by an implication arising from them, the alleged implication must be reasonably drawn from the words actually used." *Webb v. Virginian-Pilot Media Co., LLC,* 752 S.E.2d 808, 811 (Va. 2014). When examining the implications that arise from the words used, a court applying Virginia law looks at their "plain and natural meaning" as "other people would understand them, and according to the sense in which they appear to have been used." *Carwile*, 82 S.E.2d at 592. Words must also "considered as a whole." *Hyland v. Raytheon Sevs. Tech. Co*., 670 S.E.2d 746, 751 (Va. 2009) (emphasis added).

Furthermore, "[i]n determining whether the words and statements complained of in the instant case are reasonably capable of the meaning ascribed to them by innuendo, every fair inference that may be drawn from the pleadings must be resolved in the plaintiff's favor." *Carwile,* 82 S.E.2d at 591-592 (emphasis added). This "every fair inference" standard applies not only at the motion to dismiss stage, but also, as here, at the summary judgment stage. *See Tharpe v. Lawidjaja*, 8 F. Supp. 3d 743, 786 (W.D. Va. 2014) (explaining, on summary judgment, that the

statements at issue "taken in the context of their ordinary and common acceptance as the average citizen would understand them, and with every fair inference attributed to the statements, and in the context of the record developed in support of Plaintiff's claims, could fairly be determined defamatory under Virginia law.").

> **2.** **Where There Are Competing Interpretations Of The Allegedly Defamatory Words, At Least One Of Which Is Capable Of Being Defamatory, Summary Judgment Must Be Denied**

Next, at the summary judgment stage in a defamation action, courts cannot grant judgment to the defendant as to whether the statements at issue are capable of defamatory meaning if at least one interpretation is defamatory. *See Corporate Training Unlimited v. NBC,* 868 F. Supp. 501, 507 (E.D.N.Y. 1994) ("If the statement is susceptible of more than one meaning, it is for the jury to determine in which sense the words were used . . . and the Court cannot properly dismiss the action as a matter of law so long as one possible interpretation of the statement is defamatory.") (internal citations and quotation marks omitted); *Lasky v. American Broadcasting Cos. Inc.*, 631 F. Supp. 962, 968 (S.D.N.Y. 1986) ("If the program is ambiguous and capable of supporting several meanings, one of which is defamatory, it is for the jury to decide whether the defamatory meaning was, in fact, the one intended and understood."). As such, "for the defendant to prevail on its motion, the court must find, that as a matter of law, the [television] program could not have had a defamatory meaning under any of one or more reasonable interpretations." *Lasky,*

631 F. Supp. at 968. "It is only when the court can say that the publication i***s not***

***reasonably capable of any defamatory meaning and cannot be reasonably***

***understood in any defamatory sense that it can rule as a matter of law***, that it was

not libelous." *White v. Fraternal Order of Police*, 909 F.2d 512, 518 (D.C. Cir. 1990)

(emphasis added).

> ### 3. Defamation Claims Involving Television Stories Must Be Analyzed With Particular Sensitivity To All Of The Various Components Of The Video Broadcast

Finally, Horne's defamation claim involves a television broadcast. As such,

this Court must be sensitive to the fact that television is a more powerful medium

than print media when it comes to the ability to defame a person. As courts have

recognized: "[t]elevision touches more senses than does the print media, and the

standards for finding defamation cannot be woodenly applied without taking into

account the kind of medium by which the message was delivered." *White*, 909 F.2d

at 526. Indeed, "television news reporting is a different, more powerful genre than

newsprint." *Id.* and it has a unique power to "exacerbate the defamatory effect" of

a false story about someone. *Stokes v. CBS,* 25 F. Supp. 2d 992, 999 (D. Minn. 1999).

As a result of this, "[i]n order to answer the question of whether the meaning

reasonably conveyed by a statement made in a television broadcast is reasonably

understood in a defamatory sense, the video context in which the statement is made

26

must also be examined." *West v. Media Gen. Operations, Inc.*, 2005 U.S. App.

LEXIS 1586 at *44 (6th Cir. Jan. 31, 2005). As noted:

> [T]elevision programs are divided into a number of video and audio segments. In some segments, the audio and video are of the same event such as when a person makes a remark or statement on camera. In other segments, the audio may be a "voice-over" to a different video or photograph. "It is the juxtaposition of these varying segments into an audio and video mosaic that conveys the meaning or meanings intended." * * * In reviewing a television broadcast for possible defamatory statements, a court and jury cannot confine their analysis to the words alone. The court and jury are necessarily required to also consider the impact of the video portion of the program since the television medium offers the publisher the opportunity, through visual presentation, to emphasize and convey ideas in ways that cannot be ascertained from a mere reading of the words in a written transcript.
>
> * * *
>
> Although it is important, as in any defamation case, to focus on the words and language published by the defendant, this should not be the only focal point to the exclusion of other relevant facts and details. The words must be viewed in their proper context in juxtaposition to all of the audio and visual components of the television broadcasts as a whole. The defendant's defamatory words, standing alone, cannot readily be identified in isolation without also considering the accompanying visual images, the tone of voice of the announcer or reporter, along with the combined audio and video editing effects. If words are taken completely out of the context of the audio and visual components of the television broadcasts as a whole, then it would not constitute a satisfactorily accurate, effective method for identifying televised statements and visual images which are alleged to have a combined defamatory meaning.

*West*, 2005 U.S. App. LEXIS 1586 at *40-41 (emphasis added).

4.     **Summary Judgment Was Properly Denied By The District Court Because WTVR's Broadcast Is Reasonably Capable Of Being Defamatory To Horne**

As has been recognized by this Court, "[t]he Virginia standard for determining whether words are capable of defamatory meaning derives from the common law:

> At common law defamatory words which are actionable per se are: (1) Those which impute to a person the commission of some criminal offense involving moral turpitude, for which the party, if the charge is true, may be indicted and punished. (2) Those which impute that a person is infected with some contagious disease, where if the charge is true, it would exclude the party from society. (3) Those which impute to a person unfitness to perform the duties of an office or employment of profit, or want of integrity in the discharge of the duties of such an office or employment. (4) Those which prejudice such person in his or her profession or trade."

*Wells v. Liddy*, 186 F.3d 505, 522 (4th Cir. 1999) (quoting *Carwile*, 82 S.E.2d at 591). Moreover, it "is not always clear whether particular words actually charge a person with a crime of moral turpitude or unfitness for employment or the like, but the general rule of interpretation is that 'allegedly defamatory words are to be taken in their plain and natural meaning and to be understood by courts and juries as other people would understand them, and according to the sense in which they appear to have been used.'" *Hatfill v. New York Times Co.*, 416 F.3d 320, 331 (4th Cir. 2005).

Here, applying the above principles, the evidence in this case showed and shows that WTVR's broadcast is reasonably capable of defaming Horne. First, the case of *Carwile v. Richmond Newspapers, supra*, is directly on point. In that case, a

Richmond attorney sued the local newspaper after it published an article about him. The article truthfully stated how an investigation of alleged graft and corruption in the city's police department that had been championed by the attorney at issue had uncovered no wrongdoing by any officials. It then interviewed some of the city officials to ask whether they might bring bar complaints against the attorney. After a sentence where a city official specifically declined to say whether he would or would not bring bar charges, the article truthfully stated:

> Under the State Code, the State Bar as an administrative agency of the Supreme Court of Appeals may request a court of competent jurisdiction to disbar an attorney for violation of the ethical code governing the professional conduct of attorneys.

*Id.* at 589-590. The attorney sued for defamation, but the trial court granted summary judgment against him, concluding that the article was literally true.

The Supreme Court of Virginia reversed. Agreeing with the attorney, the Court held that the language of the article was capable of defamatory meaning. It explained:

> it is a reasonable implication of this language, read in connection with the whole article, that the plaintiff is guilty of unethical and unprofessional conduct for his charges made against the Police Department; for which conduct the defendant suggests in a veiled but pointed way that the plaintiff could and should be subjected to disbarment proceedings under Code, § 54-74, et seq. While the defamatory language does not in express terms charge the plaintiff with a breach of his professional honor, yet, when aided by the innuendo, operating within the scope of its legitimate functions, it does impute conduct tending to injure him in his profession.

29

Id. at 592 (emphasis added).

So too here. Like the article in *Carwile*, WTVR's news story about Horne "in a veiled but pointed way" suggested she was guilty of a Class 1 misdemeanor for misrepresenting the fact she was a convicted felon when she initially applied for her job at the School System. While this accusation is not stated in express terms, the evidence shows that entirety of the story (including the narrative that, in a very specific order, intentionally (i) laid out the fact that a felon had recently been hired and then fired by the School System; (ii) talked about the fact that the initial application asked if the applicant had ever been convicted of a crime, (iii) talked about the background check process, (iv) explained that the person would start employment even as the background check was proceeding, (v) explained how the background check could reveal "disqualifying" information, and (vi) then pointedly and specifically explained that making a misrepresentation about one's criminal past in a school application is a Class 1 misdemeanor), when aided by innuendo, leaves no doubt that the story falsely accused Horne of criminal conduct. As such, like plaintiff in *Carwile*, Horne has shown that the statements at issue are reasonably capable of defaming her.

Second, in denying WTVR's initial motion to dismiss, the District Court held that "a plausible inference from [WTVR's] news story is that [Horne] committed a crime in falsely certifying that she had no prior felony convictions, which constitutes

30

defamation per se." July 13, 2016 Order, Dkt. Entry. No. 14, at 3-4. The summary judgment record did nothing to change this conclusion. Indeed, the record in this case is identical to, if not stronger than, summary judgment records in other defamation cases where plaintiffs claimed to have been defamed by television news stories and where courts have denied summary judgment. See, e.g., *Tomblin v. WHCS-TV8,* 434 Fed. Appx. 205 (4th Cir. May 11, 2011) (reversing summary judgment against plaintiff and holding, that an article about abuse at a day care center "produced a false 'implication, innuendo or insinuation' about the daycare."); *Shadle v. NEXSTAR Broad. Grp., Inc* 2016 U.S. Dist. LEXIS 118379 (M.D. Pa. Aug. 31, 2016) (recommending the denial of summary judgment where, among other things, television news story used misleading banners and images as part of its news story); *Corporation Training Unlimited, Inc. v. NBC, Inc.*, 868 F. Supp. 501 (E.D. N.Y. 1994) (denying summary judgment to NBC because video of news story left defamatory impression on the "ordinary member of the viewing public.").

## 5. WTVR's Attempt To Spin Its Story Into A Tale Solely About The "Hiring Process" Is Inconsistent With Its Own Testimony

For its part, WTVR, as it did unsuccessfully in the District Court, cries foul because it says all it ever did was broadcast a news story about the "hiring process." But this argument simply cannot be squared with either the testimony of Covil or the

text and video that was placed into the story itself. Covil, for example, while repeatedly invoking the "hiring process" mantra, conceded at his deposition and at trial that (i) the story was prompted in the first instance by the concern that there was a felon working in the school board office; (ii) that the initial pitch for the story was to find out whether a felon had, in fact, been hired;  (iii) that the felon concern was, in fact, the "lead-in" to the hiring process part of the story; (iv) that the felon and the hiring process were "connected"; and (v) that the very first sentence of the website text for the story does not focus on the hiring process at all but instead focuses on an individual – namely, the felon. The video and texts version of the story then hammer these admissions home by, for example, opening the entire text version of the story with the bolded title "Convicted felon worked at school board office in Central Va.", having Supers throughout the story that said "Felon Hired Then Fired" and explaining in the text of the story that the alleged felon no longer works at the school system."  With all inferences in favor of Horne, this Court cannot say as a matter of law that no reasonable viewer would view this story solely about the hiring process and not about the felon, who, of course, was Horne.

> **6.    WTVR's Focus On The Alleged Literal Truth Of Its Statements In Its News Story Misses The Point And Does Not Provide It With A Defense To Horne's Claim**

WTVR also seeks refuge in its claims that its story cannot reasonably be construed as defamatory because all its factual information is literally true.  This gets

WTVR nowhere. As has been explained "the touchstone of implied defamation claims is an artificial juxtaposition of two true statements or the material omission of facts that would render the challenged statement(s) non-defamatory." *Toney v. WCCO TV,* 85 F.3d 383, 387 (8th Cir. 1996). As such, "[u]nder this definition, a defendant does not avoid liability by simply establishing the truth of the individual statement (s); rather, the defendant must also defend the juxtaposition of two statements or the omission of certain facts." *Id. See also Fanelle v. LoJack Corp.*, 2000 U.S. Dist. LEXIS 17767 at*8-9 (E.D. Pa. Dec. 7, 2000) ("the literal accuracy of separate statements will not render a communication 'true' where, as here, the implication of the communication as a whole was false"); *Michaelis v. CBS, Inc*., 119 F.3d 697, 701 (8th Cir. 1997) ("In an implied defamation case, a defendant does not avoid liability by simply establishing the truth of the individual statement."); *Memphis Publishing Co. v. Nichols*, 569 S.W.2d 412, 420 (Tenn. 1979) ("Truth is available as an absolute defense only when the defamatory meaning conveyed by the words is true."). Here, WTVR simply cannot escape liability in this case – especially on summary judgment – based on literal truth.  As Horne has made clear, the overall message conveyed by the broadcast is false.

33

**B.    WTVR's Story Is Not Protected By The Fair Report Privilege**

Related to its claim of truth, WTVR, as it did below, claims that its story is protected by the fair report privilege. On summary judgment, the District Court made short work of WTVR's argument and properly so.  It explained:

> The fair report privilege, recognized by most jurisdictions, protects "press reports of official actions or proceedings, so long as the report was accurate and either complete or fairly abridged." *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1097 (4th Cir. 1993). In the relevant jurisdictions, the Supreme Court of Virginia has not addressed this privilege for half a century,7Link to the text of the note and the Fourth Circuit has recognized a fair report privilege in certain situations, seemingly based on constitutional considerations.8Link to the text of the note Regardless of the legal basis for the fair report privilege that WTVR raises, any such privilege at least requires that the report be fair and accurate.
>
> In this case, WTVR cannot claim the fair report privilege because it did ***more than simply report what Browder, as the Superintendent for the School System, said about the hiring process. In the segment, WTVR juxtaposed what Browder said with its report that the School System had hired, and then fired, a convicted felon, and with the "Felon Hired, Then Fired" banner displaying throughout the story. Accordingly, WTVR cannot rely on the fair report privilege in this case***.

JA687-688 (emphasis added).

The District Court's ruling is sound.  Construed as it must be in Horne's favor, the news story is neither fair nor accurate.  Notably, while Browder's interview helped lay the necessary factual context for WTVR's false innuendo, it did not – and does not, by itself, – create any false negative criminal inferences about Horne. WTVR did that on its own by adding banners, adding screen shots, and otherwise

34

slanting the entire news story. The best example of why the privilege was abused is at the very end of the television and internet video versions of the story where *Covil* – not Browder – creates the defamatory innuendo that Horne lied on her employment application by stating – on its own – that it is a misdemeanor criminal offense to make a misrepresentation on a public school employment application. The District Court therefore was right to say that WTVR had not fairly and accurately stated the comments at issue, especially where the evidence showed that WTVR "misplaced [the information] in such a manner as to convey an erroneous impression to those who hear or read it." RESTATEMENT (SECOND) OF TORTS, § 611, comment f. *See also Banka v. Columbia Broad. Co*., 63 F. Supp. 3d 501, 509 (E.D. Pa. 2014) ("In this case, while the May 1 Report is a privileged occasion because it is for the most part focused on a state court malpractice case filed against Dr. Banka, it is possible that some statements in both the Internet article and televised report constituted an abuse of that privilege.").

## II.    The Evidence, When Construed In Horne's Favor, Undeniably Showed That WTVR Acted Negligently

There are many situations in everyday television reporting where a reporter conducts a detailed, thorough, and multi-sourced news story. This isn't one of them. Covil not only got the message of the story factually wrong – that is, the message that Horne had lied on her application – he had numerous opportunities to get it right, but failed to use any manner of reasonable care to do so. Horne, of course, believes

that Covil and WTVR acted with reckless disregard for the truth or falsity of the story, which, by definition includes negligence. But even beyond that, the record evidence is crystal clear that Covil (i) failed to follow up on the anonymous e-mail; (ii) failed to follow up with his confidential source – even after being told to do so by his supervisor; (iii) failed to follow up with the School Board after learning that the School Board knew about Horne's felony conviction; and (iv) failed to follow up with Browder after receiving the anonymous e-mail. These actions are easily considered negligent, especially when compared to similar actions that the Virginia Supreme Court found to be negligent in *Lipscomb*. 362 S.E.2d at 38 (explaining that with respect to information that was have properly told the reporter about the truth of his story, "the jury could have inferred from the evidence that Cox could have obtained this information from the students he interviewed but negligently failed to do so.").

### III. Under No Circumstances Is Horne A "Limited Purpose" Public Figure

As its final cross-appeal argument, WTVR contends that Horne "is a limited purpose public figure for the limited purpose of commenting on the controversy surrounding her hiring and firing." Appellee's Br. at 54. This is an extraordinary position to take and one that finds no support at all in the governing decisional law. Essentially, WTVR's position would turn every governmental employee into a

limited purpose public figure solely based on the fact he or she submitted an employment application. This goes way too far.

### A.    General Principles Of Law Applicable To Limited Purpose Public Figure Analysis

To begin, similar to the "public official" analysis, determining whether a person is a limited purpose public figure for purposes of his or her defamation claim is a "two-part inquiry." *Carr v. Forbes,* 259 F.3d 273, 278 (4th Cir. 2001). First, the court must determine "whether the public controversy gave rise to the defamatory statement." *Id.* Second, the court must determine "whether the plaintiff's participation in that controversy sufficed to establish him [or her] as a public figure within the context of that public controversy." *Id*. at 280.

The second element of the two-part inquiry focuses on the "nature and extent of [the plaintiff's] participation" in the public controversy. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 351-52 (1974). A plaintiff such as Horne meets this second element only if she satisfies the following five criteria: "(1) [she] had access to channels of effective communication; (2) [she] voluntarily assumed a role of special prominence in the public controversy; (3) [she] sought to influence the resolution or outcome of the controversy; (4) the controversy existed prior to the publication of the defamatory statement; and (5) [she] retained public-figure status at the time of the alleged defamation." *Hatfill v. N.Y. Times Co*., 532 F.3d 312, 319 (4th Cir. 2008) (quoting *Foretich v. Capital Cities/ ABC, Inc*., 37 F.3d 1541, 1553 (4th Cir. 1994)).

37

Distilling these factors to their essence, it must be shown that Horne somehow "thrust [herself] to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Gertz,* 418 U.S. at 345.

This "limited purpose public figure" analysis is necessarily case specific and is often a thorny issue for courts. As has been observed, "[d]efining public figures is much like trying to nail a jellyfish to the wall." *Rosanova v. Playboy Enterprises, Inc.*, 411 F. Supp. 440, 43 (S.D. Ga. 1976), *aff'd,* 580 F.2d 859 (5th Cir. 1978). Even so, courts typically perform the analysis bearing in mind the competing concerns of the public figure doctrine:

> Where a public controversy exists, there is a First Amendment interest in providing the breathing space necessary to ensure free debate on the issues involved. At the same time, unless the plaintiff has ***intentionally sought or attained a position of influence with respect to the particular controversy, and thus in some sense waived or rendered unnecessary the full protection afforded by state law***, the First Amendment interest in providing breathing space for debate must yield, in part, to the strong state interest in providing a means of recovery from those who engage in defamation.

*Wayment v. Clear Channel Broadcasting, Inc.*, 116 P.3d 217, 288 (Utah 2005) (emphasis added).

### B.   Horne Fails To Satisfy At Least Three Of The Second-Element Limited-Purpose Public Figure Criteria

#### 1.   Horne Did Not Have Access To Channels Of Effective Communication

First and foremost, Horne fails on the very first of the five second-element criteria: having access to channels of effective communication. In this regard, it should be remembered that the whole notion of the limited purpose public figure doctrine is founded upon the notion that a public figure has the effective ability to defend himself or herself in the media more readily than the private individual. As the Supreme Court has explained: "[p]ublic officials and public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract the false statements than private individuals normally enjoy." *Gertz*, 418 U.S. at 344 (1974). Here, Horne had no special access to channels of communication.

#### 2.   Horne Did Not Assume A Role Of "Special Prominence" In The Controversy

Second, Horne did not assume a role of special prominence as to the controversy at issue. To be sure, she did fill out an application for employment at the School System. However, unlike persons who advocate for certain positions – i.e., gun control advocates or pro-life advocates – Horne did not lobby, advocate or take a prominent public position stating that felons should be hired by public schools or that laws that prevent such hirings should be rescinded. *Compare Hatfill*, 532 F.3d

39

at 324 (plaintiff achieved a role of special prominence with respect to the nation's preparedness for bioterrorism attacks where he "was not only repeatedly sought out as an expert on bioterrorism, but was also a vocal critic of the government's unpreparedness for a bioterrorist attack, as evidenced by the topics of his lectures, writings, participation on panels, and interviews"). Indeed, WTVR presented no evidence – and none exists –  that Horne ever gave public statements or made any kind of entreaties or solicitations to legislators or the like.  Rather, she was a private person caught up in a situation that was not her fault.

### 3.    Horne Did Not Seek To Influence The Resolution Or Outcome Of The Controversy

Finally, Horne did not seek to influence the resolution or outcome of the public controversy surrounding the controversy. Indeed, Horne made no public comment to anyone at any time prior to the running of the story.  To be sure, Horne filed post-publication lawsuits.  But this standard requires that the plaintiff be judged according to pre-publication efforts to influence the controversy. *Pendleton v. City of Haverhill*, 156 F.3d 57, 68 (1st Cir. 1998) ("one does not become a public figure merely by defending oneself publicly against accusations"). *See also Foretich*, 37 F.3d at 1559 (holding that a person publicly accused of misconduct does not lose his status as a private individual simply "because he or she makes reasonable public replies to those accusations"). Here, no such pre-publication statements exist.

40

### 4. WTVR's Legal Authorities Do Nothing To Show That Horne Is A Limited Purpose Public Figure

In its brief, WTVR claims to find especial support in the cases of *Freedlander v. Edens Broadcasting, Inc.*, 734 F. Supp. 221 (E.D. Va. 1990) and *WJLA-TV v. Levin*, 564 S.E.2d 383 (Va. 2002). Neither case, however, even remotely helps WTVR's position.

*Freedlander* is readily distinguishable on its facts and lends no support to WTVR. Critically, the plaintiff there, unlike Horne here, had become infamous and the subject of numerous news stories long before the radio broadcast of a comedic song upon which his lawsuit was based. *Freedlander*, 734 F. Supp. at 224 (noting "Mr. Freedlander's notoriety at the time of the broadcast"). Indeed, in its opinion, the district court identified five separate newspaper articles – from two different papers -- which publicly discussed the trials and tribulations of Mr. Freedlander. *Id.* at 226, n.7. As the court there explained:

> Essentially, those articles reported that settlements had been reached in two lawsuits against Mr. Freedlander, who had filed personal bankruptcy and whose second-mortgage company was also in bankruptcy. Both suits involved allegations by two banks of fraud and misrepresentation. At least two news articles reported that Mr. Freedlander's company was believed to be under the scrutiny of the FBI. Another article reported the fact that Mr. Freedlander's companion and roommate had sold some of her jewelry to pay part of his debt to his former wife.

*Id.*

Here, by contrast, no similar pre-broadcast publicity exists. Horne was not infamous or notorious before WTVR defamed her. She was simply a person who had the audacity to apply to a job at a local public-school system and who was hired – through no fault of her own – in violation of Virginia law. She did not create the controversy at issue in this case; she was the victim of it – first as to the illegal hiring and second as to WTVR's defamatory news story about her hiring.

Similarly, *Levin* is of no help to WTVR. Indeed, to make its point, WTVR essentially arrogates an off-hand comment by the Virginia Supreme Court in a footnote into a rule of law. *Levin*, 564 S.E.2d at 391. This stretches *Levin* too far. The Supreme Court in *Levin* said nothing about the various factors that must be examined in order to determine whether a person is or is not a limited purpose public figure and, indeed, it conducted no published analysis whatsoever as to how or why Dr. Levin would be a limited purpose public figure. This case, then, cannot bear the weight WTVR has placed upon it.

## CONCLUSION

At the end of the day, Horne should have been allowed to complete her so-called obstacle course and cross the finish line. By failing to allow this to happen, the District Court, separate and apart from its errors discussed herein, failed to follow this Court's recognized better practice of allowing the case to go to the jury rather than short-circuiting the trial and thus failed to allow Horne to properly seek relief

42

against WTVR.  *Phoenix Sav. & Loan, Inc. v. Aetna Casualty & Surety Co.*, 427 F.2d 862, 873-874 (4th Cir. 1970).  Thus, as previously explained and as emphasized again herein, this Court should reverse the District Court's rulings and remand the case for trial on the merits.

Respectfully Submitted,

*/s/ Richard F. Hawkins, II*

RICHARD F. HAWKINS, III
HAWKINS LAW FIRM, PC
2222 Monument Avenue
Richmond, VA 23220
(804) 308-3040
rhawkins@thehawkinslawfirm.net

*Counsel for Appellant*

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**
**Effective 12/01/2016**

No. __17-1483__    **Caption:** Angela Horne v. WTVR, LLC _____

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

**Type-Volume Limit for Briefs:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines.   Appellee's Opening/Response Brief  may not exceed 15,300 words or 1,500 lines.  A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type.  See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words.  Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger.  A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[✓]   this brief or other document contains _____11628_____ [*state number of*] words

[ ]   this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

[✓]   this brief or other document has been prepared in a proportionally spaced typeface using
MS Word 2016_____ [*identify word processing program*] in
Times New Roman, 14 point_____ [*identify font size and type style*]; **or**

[ ]   this brief or other document has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font size and type style*].

(s) Richard F. Hawkins, III _____

Party Name_Appellant_____

Dated:_11/17/17_____

11/14/2016  SCC

# CERTIFICATE OF SERVICE

I certify that on __11/17/17_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Richard F. Hawkins, III
_____

Signature

11/17/17
_____

Date